## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA ANDERSON, *individually and on behalf of all others similarly situated*, | Case No. |
| Plaintiff, | **CLASS ACTION** |
| v. | **DEMAND FOR JURY TRIAL** |
| JUSTICE RESOURCE INSTITUTE, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Lisa Anderson ("Plaintiff") brings this Class Action Complaint ("Complaint") on behalf of herself and all others similarly situated ("Class Members") against Defendant Justice Resource Institute, Inc. ("Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to her, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard Plaintiff's and Class Members' sensitive personal health information ("PHI") and personal identifiable information ("PII") (PII and PHI collectively, "Personal Information"), which, as a result, is now in criminal cyberthieves' possession.

2.      Defendant is a healthcare provider serving patients with behavioral and mental health issues, developmental disabilities, and related conditions in residential, outpatient, and community-based settings across Massachusetts, Rhode Island, and Connecticut.[1]

3.      Plaintiff and Class Members are current and former patients and/or clients of

---

[1] *See* Our Story, https://jri.org/about/story (last visited July 3, 2024).

Defendant who, in order to obtain services from Defendant, were and are required to entrust Defendant with their sensitive, non-public Private Information. Defendant could not perform its regular business activities without collecting Plaintiff's and Class Members' Private Information and retain this information for many years, at least, even after the patient-provider relationship has ended.

4.      Healthcare providers like Defendant that handle Private Information owe to individuals to whom that data relates a duty to adopt reasonable measures to protect such Private Information from involuntary disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including, but not limited to, by the invasion of their private medical matters.

5.      Defendant breached these duties owed to Plaintiff and Class Members by failing to safeguard their Private Information that it collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks, which failures allowed criminal hackers to access and steal thousands of current and former patients' Private Information.

6.      According to the Notice of Data Security Incident posted on Defendant's website,[2] on or about February 15, 2024, an "unauthorized party" gained access to Defendant's information technology network (the "Data Breach"). Following its investigation, on or about May 29, 2024,

_____

[2] *See* Notice of Data Security Incident, https://jri.org/data-security-incident (last visited July 3, 2024).

Defendant determined that unknown actors hacked its network and stole data containing patients' "first and last name, address, date of birth, Social Security number, health insurance number, Medicare or Medicaid number, diagnosis, treatment information, treatment facility, provider information, or dates of treatment."3

7.      On April 26, 2024, Defendant reported to the United States Department of Health and Human Services that the Data Breach impacted 23,118 individuals.4

8.      Although the Data Breach took place on or about February 15, 2024, Defendant waited over four months to notify or warn Plaintiff and Class Members that their Private Information had been compromised, diminishing Plaintiff's and Class Members' ability to mitigate harms resulting from the Data Breach during that period.

9.      Defendant failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect its patients' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing their identities.  The present and continuing risk to Plaintiff and Class Members as victims of the Data Breach will remain for their respective lifetimes.

10.     Defendant's data security failures allowed criminal hackers to conduct a targeted cyberattack on its network systems and exfiltrate Plaintiff and Class Members' Private Information, which remains in the hands of those cyber-criminals who target such data for its value to identity thieves.

---

3 *Id.*

4 https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

11.    Defendant maintained the Private Information in a reckless manner.  In particular, Private Information was maintained on and/or accessible from Defendant's network in a condition vulnerable to cyberattacks.  Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

12.    As a direct and proximate result of Defendants' inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiff's and Class Members' Private Information has been accessed by hackers and exposed to an untold number of unauthorized individuals.

13.    The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or his life.  Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

14.    As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h)

emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in the possession of Defendant and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

15. To recover from Defendant for these harms, Plaintiff, on behalf of herself and the Class as defined herein, brings claims for negligence/negligence per se, breach of implied contract, breach of fiduciary duty, invasion of privacy, and unjust enrichment to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' Private Information in its custody and Defendant's failure to provide timely and adequate notice to Plaintiff and Class Members that their information was compromised in the Data Breach.

16. Plaintiff and Class Members seek compensatory damages, declaratory judgment, and injunctive relief requiring Defendant to (a) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information exposed; (b) implement improved data security practices to reasonably guard against future breaches of Private Information in Defendant's possession; and (c) provide, at Defendant's own expense, all impacted Data Breach victims with lifetime identity theft protection services.

## **PARTIES**

17. Plaintiff Lisa Anderson is an adult individual who at all relevant times has been a citizen and resident of Framingham, Massachusetts.

18. At all times material hereto, Plaintiff was a patient of Defendant.

19. In the course of receiving services from Defendant, Plaintiff was required to supply Defendant with her Private Information—including, but not limited to her name, date of birth, Social Security number, medical information, and other sensitive information.

20.    Plaintiff greatly values her privacy and is very careful about sharing her sensitive Private Information.  Plaintiff diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location.  She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

21.    Plaintiff would not have provided her Private Information to Defendant if she knew it would be maintained using inadequate data security that left it vulnerable to a cyberattack.

22.    At the time of the Data Breach—in or around February 2024—Defendant retained Plaintiff's Private Information in its network systems, which allowed Plaintiff's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

23.    On or about June 20, 2024, Plaintiff received a written notification sent on Defendant's behalf ("Notice Letter")[5] informing that her Private Information was accessed and exposed to unknown, unauthorized third parties through the Data Breach.  According to the Notice Letter, hackers gained access to Defendant's computer network systems on or about February 15, 2024, and acquired files containing Plaintiff's sensitive Private Information, including her full name, address, and Social Security number.

24.    In response to the Data Breach and Notice Letter, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.  Plaintiff now monitors her financial and credit statements multiple times a week and has already spent many hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

25.    Plaintiff further anticipates spending considerable time and money on an ongoing

---

[5] *See* Notice of Data Incident dated June 20, 2024, attached as Exhibit "A" hereto.

basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

26.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence or the information stolen.

27.     Plaintiff further believes her Private Information, and that of Class Members, was sold on the Dark Web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.  Moreover, following the Data Breach, Plaintiff has experienced suspicious spam and believes this be an attempt to secure additional Private Information from her.

28.     The risk of identity theft is not speculative or hypothetical, but is impending and has materialized, as there is evidence that Plaintiff's and Class Members' Private Information was targeted, accessed, misused, and disseminated on the Dark Web.

29.     Other than the Data Breach, Plaintiff is not aware of ever being part of a data breach or similar cybersecurity incident involving her Private Information and is concerned that it has now been exposed to bad actors.

30.     Subsequent to the Data Breach, Plaintiff has suffered and will continue to suffer numerous, substantial injuries including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of her Private Information; (f) invasion of privacy; and (g) the continued risk

to her Private Information, which remains backed up in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

31.     Defendant Justice Resource Institute, Inc. is a non-profit corporation organized under Massachusetts law with its principal place of business located at 160 Gould Street, Suite 300, Needham, Massachusetts 02494.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5 million, exclusive of interest and costs, and the number of Class Members exceeds 100, some of whom have different citizenship from Defendant.

33.     This Court has personal jurisdiction over Defendant because it is incorporated and headquartered in Massachusetts and is engaged in substantial and not isolated activity in this state.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has injured Plaintiff and Class Members in this District.

## FACTUAL BACKGROUND

**A. Defendant Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.**

35.     Defendant is a healthcare provider furnishing services related to mental and behavioral health, developmental disabilities, housing, and related services to patients and clients in Massachusetts, Rhode Island, and Connecticut.

36.     Plaintiff and Class Members are current and former patients and/or clients of

Defendant.

37.    As a condition and in exchange for receiving healthcare and related services from Defendant, Defendants' patients and clients, including Plaintiff and Class Members, were required to entrust Defendant with highly sensitive Private Information, including their names, addresses, contact information, Social Security numbers, medical diagnosis and treatment information, insurance information, and other sensitive data.

38.    In exchange for receiving Plaintiff's and Class Members' Private Information, Defendant promised to safeguard the sensitive, confidential data and to only it for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

39.    The information Defendant held in its computer networks at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

40.    At all relevant times, Defendant knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiff and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

41.    Defendant also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into those individuals' highly private medical information.

42.    Upon information and belief, Defendant made promises and representations to its patients and clients, including Plaintiff and Class Members, that the Private Information collected from them as a condition of obtaining services from Defendant would be kept safe and confidential, that the privacy of that information would be maintained, and that Defendant would delete any

sensitive information after it were no longer required to maintain it.

43.    Indeed, Defendant's Notice of Privacy Practices affirms, "We are required by law to maintain the privacy of your health information."[6]

44.    Defendant's published Summary of the JRI Privacy Notice further warrants that, except in specific situations not applicable here, "if we send your confidential information out of JRI even if it is for your treatment, we will obtain your permission."[7]

45.    Upon information and belief, Defendant provided its Notice of Privacy Practices and Summary of the JRI Privacy Notice to all patients receiving services, including Plaintiff and Class Members.

46.    Plaintiff and Class Members relied on these promises from Defendant, a sophisticated business entity, to implement reasonable practices to keep their sensitive Private Information confidential and securely maintained, to use this information for necessary purposes only and make only authorized disclosures of this information, and to delete Private Information from Defendant's systems when no longer necessary for its legitimate business or healthcare purposes.

47.    But for Defendant's promises to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class Members would not have sought services from or entrusted their Private Information to Defendant.  Healthcare patients and consumers, in general, demand security to safeguard their Private Information, especially when Social Security

---

[6]  *See* Justice Resource Institute – Notice of Privacy Practices, available at https://jri.org/sites/default/files/inline-files/HIPAA-002%20Form%20A%20-%20PRIVACY%20NOTICE%20-%2012-21.pdf (last visited July 3, 2024).

[7]  *See* Summary of the JRI Privacy Notice, available at https://jri.org/sites/default/files/inline-files/HIPAA-002%20Form%20B%20-%20Summary%20%20of%20JRI%20Privacy%20Notice%2012-21.pdf (last visited July 3, 2024).

numbers and sensitive medical information is involved.

48.    Based on the foregoing representations and warranties and to obtain services from Defendant, Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its promises and obligations to keep such information confidential and protected against unauthorized access.

49.    Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.  To that end, Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

50.    Defendant derived economic benefits from collecting Plaintiff's and Class Members' Private Information.  Without the required submission of Private Information, Defendant could not perform the services it provides in the course of its business.

51.    By obtaining, using, and benefitting from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

52.    Defendant had and has a duty to adopt reasonable measures to keep Plaintiff's and Class Members' Private Information confidential and protected from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its data management systems and those of their vendors and affiliates.

53.    Additionally, Defendant had and has obligations created by the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45 ("FTC Act"), HIPAA, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

**B. Defendant Failed to Adequately Safeguard Plaintiff's and Class Member's Private Information, resulting in the Data Breach.**

54. On or about June 20, 2024, Defendant began sending Plaintiff and other Data Breach victims the Notice Letter titled "Notice of Data Incident."[8]

55. The Notice Letter informs as follows:

> <u>What Happened and What Information was Involved?</u>
> JRI detected an incident in which an unauthorized third party accessed some of its systems on February 15, 2024. Upon detecting the incident, JRI took the steps necessary to address the event which included immediately shutting off all access to the network and engaging a specialized third-party forensic incident response firm to assist with securin the network environment and investigating the extent of unauthorized activity. . . . After extensive electronic discovery, which concluded on May 29, 2024, we determined that an unauthorized third party may have acquired the following personal information: first and last name, address, Social Security number.

56. Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

57. Thus, Defendant's 'disclosure' amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

58. As the Data Breach evidences, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information it collected

---

[8] *See* Notice Letter, Ex. A.

and maintained from Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed.  These failures by Defendant caused the exposure and theft of Plaintiff's and Class Members' Private Information in the Data Breach.

59.    Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.  Criminal hackers accessed and acquired files stored without reasonable security on Defendant's systems, which contained Plaintiff's and Class Members' unencrypted Private Information.

60.    Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiff's and Class Members' Private Information, but failed to do so.

61.    Defendant's tortious conduct and breach of contractual obligations, as detailed herein, are evidenced by its failure to recognize the Data Breach until cybercriminals had already accessed Plaintiff's and Class Members' Private Information, meaning Defendant had no effective means in place to ensure that cyberattacks were detected and prevented.

62.    Defendants' negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

**C. Defendant Knew of the Risk of a Cyberattack because Healthcare Providers in Possession of Private Information are Particularly Suspectable.**

63.    Defendant's negligence in failing to safeguard Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

64.    Private Information of the kind accessed in the Data Breach is of great value to hackers and cybercriminals as it can be used for a variety of unlawful and nefarious purposes,

including ransomware, fraudulent misuse, and sale on the Dark web.

65.    Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as his or her birthdate, birthplace, and mother's maiden name.

66.    Data thieves regularly target entities in the healthcare industry like Defendant due to the highly sensitive information that such entities maintain.  Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

67.    Cyber-attacks against institutions such as Defendant are targeted and frequent. According to Contrast Security's 2023 report, "Cyber Bank Heists: Threats to the financial sector," "[o]ver the past year, attacks have included banking trojans, ransomware, account takeover, theft of client data and cybercrime cartels deploying 'trojanized' finance apps to deliver malware in spear-phishing campaigns."[9] In fact, "40% [of financial institutions] have been victimized by a ransomware attack."[10]

68.    In light of recent high profile data breaches at industry-leading companies, including, *e.g.*, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion

---

[9] Contrast Security, "Cyber Bank Heists: Threats to the financial sector," pg. 5, avail. at https://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%2020 23.pdf?hsLang=en (last acc. February 9, 2024).

[10] *Id.*, at 15.

records, May 2020), Defendant knew or, if acting as a reasonable healthcare provider, should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

69.    According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[11]

70.    The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself.  According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[12]

71.    Defendant's data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting healthcare entities like Defendant that collect and store PHI.

72.    For example, of the 1,862 data breaches recorded in 2021, 330 of them, or 17.7%, were in the healthcare industry.[13]

73.    The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records

---

[11] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last accesses Feb. 9, 2024).

[12] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Feb. 9, 2024).

[13] 2021 Data Breach Annual Report (ITRC, Jan. 2022), https://notified.idtheftcenter.org/s/, at 6.

(9,700,238) in 2020.[14]

74.     Entities in custody of PHI, like Defendant, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[15] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[16] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. 40 percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[17]

75.     Thus, the healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[18]

76.     As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit

---

[14] *Id.*

[15] *See* Identity Theft Resource Center, 2022 Annual Data Breach Report, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last accessed May 8, 2024).

[16] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed May 8, 2024).

[17] *Id.*

[18] https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.

cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[19]  A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[20]

77.    As a healthcare entity in possession of its patients' and clients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached.  Such consequences include the significant costs imposed on Plaintiff and Class Members because of a breach.  Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

78.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

79.    Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways.  Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

80.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its server(s), amounting to thousands of individuals' detailed Private

---

[19] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[20] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

Information, and, thus, the significant number of individuals who would be harmed by the exposure of that unencrypted data.

81.    Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

82.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and the like.

**D.  Defendant was Required, but Failed to Comply with FTC Rules and Guidance.**

83.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making.

84.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[21]

85.    The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating

---

[21] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016),https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed May 8, 2024).

someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

86.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

87.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act.  Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations.

88.    Such FTC enforcement actions include actions against healthcare entities like Defendant. *See, e.g., In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

89.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information.  The FTC publications and orders described above also form part of the basis of

---

[22] *Id.*

Defendant's duty in this regard.

90.    The FTC has also recognized that consumer data is a new and valuable form of currency.  In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis and profit."[23]

91.    Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

92.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

**E.  Defendant was Required, But Failed to Comply with HIPAA Guidelines.**

93.    Defendant is a covered business under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C.

94.    Defendant is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. *See* 42 U.S.C. §17921; 45 C.F.R. § 160.103.

95.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting PHI

---

[23] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

that is kept or transferred in electronic form.

96.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

97.    HIPAA's Security Rule required and requires that Defendant do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.    Ensure compliance by its workforce.

98.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

99.    HIPAA and HITECH also obligate Defendant to implement procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

100.    HIPAA further requires a covered entity like Defendant to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E.  See 45 C.F.R. § 164.530(e).

101.    HIPAA further requires a covered entity like Defendant to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate.  *See* 45 C.F.R. § 164.530(f).

102.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule.  *See* 45 C.F.R. §§ 164.302-164.318.  For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."   US Department of Health & Human Services, Security Rule Guidance Material.[24]   The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[25]

103.    As alleged in this Complaint, Defendant failed to comply with HIPAA and HITECH.  It failed to maintain adequate security practices, systems, and protocols to prevent data

---

[24] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed Feb. 13, 2024).

[25] *Id.*

loss, failed to mitigate the risks of a data breach, and failed to ensure the confidentiality and protection of Plaintiff's and Class Members' Private Information, including PHI.

**F. Defendant Failed to Comply with Industry Standards.**

104. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

105. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[26]

106. In addition, the NIST recommends certain practices to safeguard systems,[27] *infra,* such as the following:

> a. Control who logs on to your network and uses your computers and other devices.
>
> b. Use security software to protect data.
>
> c. Encrypt sensitive data, at rest and in transit.
>
> d. Conduct regular backups of data.

---

[26] *See* Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Feb. 9, 2024).
[27] Federal Trade Commission, "Understanding The NIST Cybersecurity Framework," https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Feb. 9, 2024).

e.  Update security software regularly, automating those
    updates if possible.

f.  Have formal policies for safely disposing of electronic files
    and old devices.

g.  Train everyone who uses your computers, devices, and
    network about cybersecurity. You can help employees
    understand their personal risk in addition to their crucial
    role in the workplace.

107.    Further still, the Cybersecurity & Infrastructure Security Agency makes specific

recommendations to organizations to guard against cybersecurity attacks, including (a) reducing

the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's

network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing]

that software is up to date, prioritizing updates that address known exploited vulnerabilities

identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports

and protocols that are not essential for business purposes," and other steps; (b) taking steps to

quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are

focused on identifying and quickly assessing any unexpected or unusual network behavior [and]

[e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the

organization's entire network is protected by antivirus/antimalware software and that signatures in

these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an

intrusion occurs," and other steps.[28]

108.    Upon information and belief, Defendant failed to implement industry- standard

cybersecurity measures, including failing to meet the minimum standards of both the NIST

---

[28] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations,"
available at https://www.cisa.gov/shields-guidance-organizations (last acc. Feb. 9, 2024).

Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

### G. Defendant Owed Plaintiff and Class Members a Common Law Duty to Safeguard their Private Information.

109.    In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  Defendant's duty owed to Plaintiff and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected Plaintiff's and Class Members' Private Information.

110.    Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

111.    Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

112.    Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

113.    Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and

accurate manner when and how the Data Breach occurred.

114.    Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

115.    Defendant failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.  Defendant's actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

**H.  Plaintiff and Class Members Suffered Common Injuries and Damages due to Defendant's conduct.**

116.    Defendant's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' Private Information directly and proximately caused injuries to Plaintiff and Class Members by the resulting disclosure of their Private Information in the Data Breach.

117.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

118.    Plaintiff and Class Members are also at a continued risk because their Private remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' and/or clients' Private Information.

119.    As a result of Defendant's ineffective and inadequate data security practices, the resulting Data Breach, and the foreseeable consequences of their Private Information ending up in criminals' possession, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages,

including, without limitation, (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Defendant; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

### The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing

120.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

121.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[29]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[30]

122.    The link between a data breach and the risk of identity theft is simple and well established.  Criminals acquire and steal Private Information to monetize the information.

---

[29] 17 C.F.R. § 248.201 (2013).

[30] *Id.*

Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

123.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[31]  Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers.  Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[32] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

124.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[33]  The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity.  The sale of a firearm or drugs on the other hand requires a physical delivery address.  Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[34] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial

---

[31]  *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[32]  *Id.*

[33]  *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[34]  *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

harm to others."[35]

125.    The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers.  In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members.  Unauthorized individuals can easily access the Plaintiff's and Class Members' Private Information.

126.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

127.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number.  Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.  Data breaches are often the starting point for these additional targeted attacks on the victims.

128.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change.  The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive

---

[35] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[36]

129.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.  In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

130.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[37]

131.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.  In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in

---

[36] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[37] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.[38]

132.    Theft of PHI, in particular, is gravely serious as well: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[39]

133.    Health information is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[40]

134.    With respect to healthcare breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[41]

135.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[42]

136.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft.

---

[38] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[39]    *See*    Federal    Trade    Commission,    Medical    Identity    Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

[40] *Id.*

[41] https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

[42] *Id.*

Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[43]

137.    The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[44]

138.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[45]

139.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

140.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers.  In other

---

[43]    https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[44] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[45] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/  medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Feb. 26, 2024).

words, even if certain information such as emails, phone numbers, or credit card numbers may not

be included in the Private Information that was exfiltrated in the Data Breach, criminals may still

easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals

(such as illegal and scam telemarketers) over and over.

141.    Thus, even if certain information (such as driver's license numbers) was not stolen

in the data breach, criminals can still easily create a comprehensive "Fullz" package.

142.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to

crooked operators and other criminals (like illegal and scam telemarketers).

143.    The development of "Fullz" packages means that stolen Private Information from

the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone

numbers, email addresses, and other unregulated sources and identifiers.  That is exactly what is

happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this

Court or a jury, to find that their stolen Private Information is being misused, and that such misuse

is traceable to the Data Breach.

144.    Victims of identity theft can suffer from both direct and indirect financial losses.

According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained
> from misusing the victim's account or personal information,
> including the estimated value of goods, services, or cash obtained.
> It includes both out-of-pocket loss and any losses that were
> reimbursed to the victim. An indirect loss includes any other
> monetary cost caused by the identity theft, such as legal fees,
> bounced checks, and other miscellaneous expenses that are not
> reimbursed (e.g., postage, phone calls, or notary fees). All indirect
> losses are included in the calculation of out-of-pocket loss.[46]

---

[46] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).

145.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[47]

146.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[48]   Yet, Defendant failed to rapidly report to Plaintiff and the Class that their Private Information was stolen.

147.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

148.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information.  Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

149.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information.  To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud***

150.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this

---

[47] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

[48] *Id.*

Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

151.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

152.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

153.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

154.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[49]

---

[49] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Feb. 26, 2024).

155.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse.  For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

Diminished Value of the Private Information

156.    Private Information is a valuable property right.[50]  Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

157.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.  Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

158.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[51]

159.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.[52]

---

[50] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[51] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[52] https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

160.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[53]  In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[54, 55] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[56]

161.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

162.    However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.  Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary*

163.    To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach.

164.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability

---

[53] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[54] https://datacoup.com/.

[55] https://digi.me/what-is-digime/.

[56]  Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

165.     Such fraud may go undetected until debt collection calls commence months, or even years, later.  An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.  Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

166.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[57]  The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

167.     Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

168.     The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member.  This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.  This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for

---

[57] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

Defendant's failure to safeguard their Private Information.

### *Loss of Benefit of the Bargain*

169.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

170.    When agreeing to provide their Private Information, which was a condition precedent to obtain services from Defendant, and paying Defendant, directly or indirectly, for its services, Plaintiff and Class Members, as patients and consumers, understood and expected that they were, in part, paying for services and data security to protect the Private Information they were required to provide.

171.    In fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

## CLASS ALLEGATIONS

172.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States whose PII was compromised in Defendant's Data Breach occurring on or about February 15, 2024 (the "Class").

173.    Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families, and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

174.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

175.    This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation, and membership in the proposed classes is easily ascertainable.

176.    **Numerosity:** The Class described above is so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court.  The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendants' records, including but not limited to, the files implicated in the Data Breach.  According to Defendant's self-reporting, the Data Breach impacted 23,118 individuals.[58]

177.    **Commonality:** This action involves questions of law and fact that are common to all Class Members. Such common questions include, but are not limited to the following:

    a.  Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

    b.  Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' Private Information, and breached its duties thereby;

    c.  Whether Defendant failed to implement reasonable data security measures for Plaintiff's and Class Members' Private Information;

    d.  Whether Defendant breached implied contracts with Plaintiff and Class Members to use reasonable means to protect their Private Information;

    e.  Whether Defendant breached its fiduciary duties to Plaintiff and Class Members;

    f.  Whether Defendant was unjustly enriched by failing to implement reasonable or adequate data security measures for Plaintiff's and Class Members' Private Information;

---

[58] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

g.   Whether Plaintiff and Class Members are entitled to damages as a
result of Defendant's wrongful conduct;

h.   Whether Plaintiff and Class Members are entitled to restitution as a
result of Defendant's wrongful conduct; and

i.   Whether Plaintiff and Class Members are entitled to injunctive relief
to redress the imminent and currently ongoing harm faced as a result
of the Data Breach.

178.   **Typicality:** Plaintiff's claims are typical of the claims of the Class Members.  The
claims of the Plaintiff and members of the Class are based on the same legal theories and arise
from the same failure by Defendant to safeguard Private Information.  Plaintiff and Class Members
all provided their Private Information to Defendant and had their Private Information accessed,
exfiltrated, and compromised in the Data Breach.

179.   **Adequacy of Representation:** Plaintiff is an adequate representative of the Class
because his interests do not conflict with the interests of the other Class Members Plaintiff seeks
to represent; Plaintiff has retained counsel competent and experienced in complex class action
litigation, specifically litigation involving data breaches; Plaintiff intends to prosecute this action
vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action
and ensure the interests of the Class will not be harmed.  Furthermore, the interests of the Class
Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's
counsel.

180.   **Predominance.**  Common questions of law and fact predominate over any
questions affecting only individual Class Members.  For example, Defendant's liability and the
fact of damages is common to Plaintiff and each member of the Class.  If Defendant breached its
common law and statutory duties to secure Private Information on its network server, then Plaintiff
and each Class Member suffered damages from the exposure of sensitive Private Information in

the Data Breach.

181.    **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

182.    **Manageability.** The precise size of the Class is unknown without the disclosure of Defendant's records.  The claims of Plaintiff and the Class Members are substantially identical as explained above.  Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiff and the Classes.

183.    **Ascertainability.** Finally, all members of the proposed Class are readily ascertainable.  Defendant has access to Class Members' names and addresses affected by the Data Breach.  Upon information and belief, Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION
### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

184.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 183 above as if fully set forth herein.

185.    Defendant required Plaintiff and Class Members to submit private, confidential Private Information to Defendant as a condition of receiving services from Defendant.

186.    Plaintiff and Class Members provided certain Private Information to Defendant including their names, addresses, Social Security numbers, dates of birth, medical diagnosis and treatment information, and other sensitive personal information.

187.    Defendant had full knowledge of the sensitivity of the Private Information to which

it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that Private Information.

188.    Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendant.

189.    Plaintiff and the Class Members had no ability to protect their Private Information in Defendant's possession.

190.    By collecting and storing Plaintiff's and Class Members' Private Information in its network systems, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect if that Private Information was exposed to unauthorized actors and to give prompt notice to those affected in the case of a data breach.

191.    Defendant owed a duty of care to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

192.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients and/or clients, which is recognized by laws and regulations including but not limited to the FTC Act, as well as the common law. Defendant was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

193.    Defendant's duty also arose from its position as a healthcare provider. Defendant holds itself out as a trusted provider of healthcare, and thereby assumes a duty to reasonably protect its patients' Private Information. Indeed, Defendant, as a healthcare provider, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

194.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

195.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

196.    Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

197.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

198.    Defendant breached its duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

199.    The injuries to Plaintiffs and Class Members resulting from the Data Breach were

directly and indirectly caused by Defendant's violation of the statutes described herein.

200.    Plaintiffs and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

201.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

202.    Defendant's failure to comply with the FTC Act and HIPAA and regulations constitutes negligence *per se.*

203.    Defendant's duty to use reasonable care in protecting Plaintiffs' and Class Members' confidential Private Information in its possession arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to such Private Information.

204.    Defendant breached its duties, and was negligent, by acts of omission or commission, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information.  The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b.    Failing to adequately train employees on proper cybersecurity protocols;

c.    Failing to adequately monitor the security of its networks and systems;

d.    Failure to periodically ensure that its network system had plans in place to maintain reasonable data security safeguards;

e.    Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

f.  Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

205.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised and they would not have been injured.

206.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members.  Further, the breach of security was reasonably foreseeable given the known high frequency of cyber-attacks and data breaches in the industry.

207.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to them.

208.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; and (f) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

209.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-

economic losses.

210.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

211.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

### COUNT II: BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

212.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 183 above as if fully set forth herein.

213.    Defendant required Plaintiff and Class Members to provide and entrust their Private Information as a condition of obtaining services from Defendant.

214.    When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

215.    Specifically, Plaintiff and Class Members entered into valid and enforceable implied contracts with Defendant when they agreed to provide their Private Information to Defendant.

216.    The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Defendant included Defendant's promise to protect Private Information it collected from Plaintiff and Class Members, or created on its own, from unauthorized disclosures. Plaintiff and Class Members provided this Private Information in reliance on Defendant's promise.

217.    Under the implied contracts, Defendant promised and was obligated to (a) provide products and services and/or employment to Plaintiff and Class Members; and (b) protect Plaintiff's and Class Members' Private Information provided to obtain such services and/or created in connection therewith.  In exchange, Plaintiff and Class Members agreed to provide Defendant with payment and their Private Information.

218.    Defendant's adequate protection of Plaintiff's and Class Members' Private Information was a material aspect of these implied contracts with Defendant.

219.    Defendant solicited and invited Plaintiff and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

220.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act and HIPAA.

221.    Plaintiff and Class Members who contracted with Defendant for services and provided their Private Information to Defendant reasonably believed and expected that Defendant would adequately employ adequate data security to protect that Private Information.  Defendant failed to do so.

222.    A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Information to Defendant and agreed Defendant would receive payment for, amongst other things, the protection of their Private Information.

223.    Plaintiff and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendant.

224.    Defendant materially breached its contractual obligations to protect the Private

Information it required Plaintiff and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to Defendant's inadequate data security.

225.    Defendant materially breached its contractual obligations to deal fairly and in good faith with Plaintiff and Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify them of the Data Breach.

226.    Defendant materially breached the terms of its implied contracts, including, but not limited to, by failing to comply with industry standards or the standards of conduct embodied in statutes like Section 5 of the FTC Act, or by failing to otherwise protect Plaintiff's and Class Members' Private Information, as set forth *supra*.

227.    The Data Breach was a reasonably foreseeable consequence of Defendant's conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiff and Class Members.

228.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains with Defendant, and instead received products and services and/or compensation for employment of a diminished value compared to that described in the implied contracts.  Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

229.    Had Defendant disclosed that its data security was inadequate or that it did not adhere to industry-standard security measures, neither Plaintiff, Class Members, nor any reasonable person would have contracted for employment with Defendant.

230.    Plaintiff and Class Members would not have provided and entrusted their Private Information to Defendant in the absence of the implied contracts between them and Defendant.

231.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

232.    Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to provide timely or adequate notice that their Private Information was compromised in and as due to the Data Breach.

233.    As a direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class Members and the attendant Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendant.

234.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

235.    Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide adequate credit monitoring to all Class Members.

## COUNT III: BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

236.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 183 above as if fully set forth herein.

237.    Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

238.    As a healthcare provider, Defendant has a fiduciary relationship with its patients, like Plaintiff and Class Members.

239.    Because of that fiduciary relationship, Defendant was provided with and stored private and valuable Private Information related to Plaintiff and the Class, which it was required to maintain in confidence.

240.    Defendant owed a fiduciary duty under common law to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

241.    As a result of the parties' fiduciary relationship, Defendant had an obligation to maintain the confidentiality of information within Plaintiff and Class Members' medical records.

242.    Patients like Plaintiff and Class Members have a privacy interest in personal medical matters, and Defendant had a fiduciary duty not to disclose patients' medical data.

243.    As a result of the parties' relationship, Defendant had possession and knowledge of confidential Private Information of Plaintiff and Class Members, information not generally known.

244.    Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their Private Information to an unknown criminal actor.

245.    Defendant breached the fiduciary duties owed to Plaintiff and Class Members by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; (b) mishandling its data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the

circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to their patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff and the Class Members' Private Information to a criminal third party.

246.    But for Defendant's breach of its fiduciary duties owed to Plaintiff and Class Members, their privacy, confidences, and Private Information would not have been compromised.

247.    As a direct and proximate result of Defendant's breaches of fiduciary duties owed to Plaintiff and Class Members, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; and (f) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

248.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### COUNT IV: UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

249.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 183, as if fully set forth herein.

250.    This count is brought in the alternative to Plaintiff's breach of implied contract

count above.

251.    Plaintiff and Class Members conferred a benefit on Defendant by way of paying and providing their Private Information to Defendant as part of Defendant's business as a healthcare provider.

252.    The monies paid to Defendant were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and Class Members.

253.    Defendant failed to provide reasonable security, safeguards, and protections to the personal information of Plaintiff and Class Members, and as a result Defendant was overpaid.

254.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money because it failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' personal information that they paid for but did not receive.

255.    Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

256.    Defendant's enrichment at Plaintiff's and Class Members' expense is unjust.

257.    As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

### COUNT V: INVASION OF PRIVACY/INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Class)

258.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 183 above as if fully set forth herein.

259.    Plaintiff and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to Defendant's protection of this Private Information in its

possession against disclosure to unauthorized third parties.

260.    Defendant owed a duty to its patients and clients, including Plaintiff and Class Members, to keep their Private Information confidential and secure.

261.    Defendant failed to protect Plaintiff's and Class Members' Private Information and instead, exposed it to unauthorized persons which is now publicly available, including on the dark web, and being fraudulently misused.

262.    Defendant allowed unauthorized third parties access to and examination of the Private Information of Plaintiff and Class Members, by way of Defendant's failure to protect the Private Information.

263.    The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiff and Class Members is highly offensive to a reasonable person.

264.    The intrusion was into a place or thing, which was private and is entitled to be private.  Plaintiff and Class Members disclosed their Private Information to Defendant as a condition of receiving services, but privately with an intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure.  Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

265.    The Data Breach constitutes an intentional or reckless interference by Defendant with Plaintiff's and Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

266.    Defendant acted with a knowing state of mind when it permitted the Data Breach

to occur because it had actual knowledge that its information security practices were inadequate and insufficient.

267.    Defendant acted with reckless disregard for Plaintiff's and Class Members' privacy when it allowed improper access to its systems containing Plaintiff's and Class Members' Private Information without protecting said data from the unauthorized disclosure, or even encrypting such information.

268.    Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' Private Information.

269.    Because Defendant acted with this knowing state of mind, it had notice and knew of the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

270.    As a direct and proximate result of Defendant's acts and omissions set forth above, Plaintiff's and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer injuries and damages as set forth herein, including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

271.    Unless and until enjoined, and restrained by order of this Court, Defendant's

wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the Private Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lisa Anderson, on behalf of herself and all others similarly situated, prays for judgment as follows:

A.      An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.      Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C.      Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D.      Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E.      Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F.      Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the transmitted Private Information;

G.      Awarding attorneys' fees and costs, as allowed by law,

H.      Awarding prejudgment and post-judgment interest, as provided by law;

I.      Granting Plaintiff and the Class leave to amend this complaint to conform to the

evidence produced at trial; and,

J.      Any and all such relief to which Plaintiff and the Class are entitled.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: July 19, 2024                              Respectfully submitted,

*/s/ Christina Xenides*
Christina Xenides, Esq.
Massachusetts Bar No. 677603
**SIRI & GLIMSTAD LLP**
1005 Congress Avenue, Suite 925-C36
Austin, TX 78701
Tel: (646) 357-1732
E: cxenides@sirillp.com

and

Kenneth J. Grunfeld, Esq.*
New Jersey Bar No. 026091999
Jeff Ostrow, Esq.*
Florida Bar No. 121452
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
65 Overhill Road
Bala Cynwyd, PA 19004
Tel.: (954) 525-4100
E: grunfeld@kolawyers.com
E: ostrow@kolawyers.com

(*pro hac vice application forthcoming)

*Attorneys for the Plaintiff and Putative Class*